The next matter on our calendar is United States v. Krug and Wendell. Good morning, Your Honor. May I please the court? My name is Joseph Karashevsky. I represent the appellant United States of America on this appeal. The district court in this case erred in broadly and imprecisely extending the attorney-client privilege to the communication that Mr. Wendell made to his co-defendants in this case. And in this case, he made the statement solely to his co-defendants and there is nothing in this record. Outside the presence of counsel. Outside the presence of counsel. The judge stressed that counsel was right on the other side of the door. That's correct, Your Honor. And in saying that counsel was right on the other side of the door, the judge acknowledged, the district court acknowledged that the presence of counsel was important to this determination as to whether or not this statement was protected by the attorney-client privilege. However, the judge created the fiction that this, the presence on the other side of the door, just the geographical proximity, somehow made him effectively present. That extends the attorney-client privilege beyond the principles that underlie it. And it extends it in derogation of the principle that it should be narrowly construed in reference to its purposes. Here, of course, the law is clear that the purpose of the attorney-client privilege is to promote the free flow of information between a client and that client's attorney. And under these circumstances, where you have multiple defendants, to promote the free flow of information for the purpose of obtaining legal advice to other individuals, to co-defendants and their attorneys as well. Under these circumstances, where the record only shows that these defendants were standing in the hall, talking about their defense, admittedly talking about their defense. But there is nothing in the record that would support the conclusion that they were seeking, that either Mr. Wendell was seeking legal advice, or even that he had received legal advice from his attorney and he was conveying it to the other defendants. Well, there is something in the record that suggests that he was seeking legal advice, although not seeking it in that conversation. Because he testified, if I recall correctly, that he had sent the video that prompted this idea that one could testify in this fashion. He said he had sent it to his lawyer, right? Yes, Your Honor. There is something in the record, but it doesn't establish that he was seeking legal advice by the conversation in which he said these things to the co-defendant. That's correct, Your Honor. And that's an important distinction. And I would say it wasn't testimony. That comes into the record. That was the statement, or that's the proffer, of what Lieutenant Kwiatkowski would testify to about that conversation. So, Lieutenant Kwiatkowski, who is the prospective government witness in this case now, did say that when he overheard this conversation between Wendell and Krug, Wendell said, I've sent it to my attorney. And that ended there. That's as far as it went. So, there was no disclosure of whatever, if anything, the other guy and his attorney talked about. That's correct, Your Honor. And just as a matter of the record in this case, too, there's no indication that his counsel ever received it. Nor is there indication that he had a conversation with his counsel about it. The only thing is that Kwiatkowski would testify that what he heard included the words, I sent it to my attorney, not I discussed it with my attorney. Precisely. And it ended there. So, in this case, the district court completely omitted in its analysis of whether or not the attorney-client privilege should apply in this case, completely omitted the vital requirement that the communication that is sought to be protected by the attorney-client privilege had been made for the purpose of seeking legal advice. That's what they were talking about. Well, they were talking about their defense, Your Honor. I think it... They were talking about the legal defense that they could put before the jury. Well, I would disagree with that, Your Honor. They were talking about what facts might support a defense to the charges in this case, a specific piece of evidence that the government intended to prove at trial or intended to introduce at trial, namely that another officer at the scene had heard the gun discharged. What they were discussing and what Mr. Wendell was discussing was, geez, I saw this video on YouTube and it can make that sound if you're taking the CO2 cartridge out. So that's not a legal issue there. And certainly, as Judge LaValle... Isn't it alibi information or alternative... But isn't that... Isn't it an opportunity for them to plan a defense that they didn't shoot the gun? Sure. Yes. But the discussion... But that doesn't end the issue. That doesn't end the issue when the government has acknowledged that, yes, the conversation that they were having, that Krug was having with Wendell and Wendell was having with Krug, concerned a defense strategy. But it did not... It was not made for the purpose of seeking legal advice from their attorney. It was not made to an attorney for the purpose of seeking legal advice, and it had nothing to do with any advice that Mr. Wendell may have gotten from his attorney. As Judge LaValle pointed out, at the conclusion of this hallway discussion, one of them said, I'm going to send it to my attorney. Actually, he said he already sent it to his attorney. He said, I sent this video to Rod, which is a reference to his attorney. Rodney. Rodney, yes, I'm sorry. So that was a reference to Mr. Personius. It could have been no one else. So, yes, he in fact did say, I sent this. But that does not cloak this conversation with the protections of the attorney-client privilege. You would be making the same argument, I take it, you would be making the same argument if they had gone on to say, if Wendell had added to that, we really need to talk with our attorneys about this and see whether it provides an airtight defense, see whether they advise us to testify in this fashion or not, et cetera. Even if they indicated between them an intention to discuss it with their attorneys, it's still this conversation between them was not a conversation made with an attorney seeking legal advice, nor was it a conversation about legal advice received from an attorney. That's absolutely correct, Your Honor, and that is our position with regard to this. So because the district court in this case missed this critical element and did not analyze this critical element of the attorney-client privilege, the decision in order of the district court should be reversed. Thank you, counsel. Thank you. You're reserved two minutes for rebuttal. May it please the court. My name is Terrence Connors. I appear on behalf of Officer Krug. My colleague has offered two reasons to reverse the district court. I'll respond to both of those reasons, speak briefly about some new case law that's been decided, even this court's case four months ago in which Judge Pooler and Judge Hall took place, and then my colleague will talk a little bit about the Barrett case as well. The first reason he offers is that the lawyer was not physically present. He wasn't standing right next to the individuals. Well, there are two answers to that. He was not within earshot. Well, the record says just steps away. The accurate statement is that he was inside. We were inside a conference room. He was outside a conference room just outside the courtroom. The district judge didn't suggest that the lawyer heard the conversation or was being addressed in the conversation. Absolutely not. He said the lawyer was nearby. Just steps away was the word. Would it have made a difference if the door was open and he sort of was within earshot? I know that's a hypothetical because the door was closed, wasn't it? It was closed, and I don't think so because we weren't participating in that conversation. That clearly was a conversation, and this is important, between members of a joint defense agreement who had been operating under that agreement for two-plus years for common interests, uncontested. They withdrew that argument down below because it's no question that there's a common legal interest involved here. So the court below . . . Who withdrew? Originally, they said they challenged the existence of a joint defense agreement. Let's take that. Let's explore that. You've got the lawyers are out, whatever they're doing. The three defendants get together and say, here's what we can say. Let's say this, this, and this happened. I've seen something on YouTube, and I know maybe all of us know this. I certainly know that if you cock an air pistol and pull the trigger, it sounds like it's shooting something, right? So why don't we just say that that's what happened here? Well, that's . . . Excuse me. That seems to me pretty much like planning to cook the evidence, which I would suggest verges on a felony if it's not one. Yes. Can they testify about that under the exception, the crime exception? That issue was aired in its entirety before the district court judge . . . Right. . . . and then dropped for this appeal because they could not establish the crime for exception because the statement was, we're talking about our defense. I saw a video. I did some research. I sent it to my attorney. It could explain. It is, as you suggested, an alternative defense, which, Your Honor, we as lawyers are bound to pursue and examine to see if it has some merit. And, Officer Kwiatkowski, what was your impression of what they were talking about as you participated in it? My sense was that they were trying to fashion a view of the facts, which didn't comport with what really happened, and that they were trying to cover up. Well, you've introduced another evidentiary hurdle there, but I would say to that that it's still an effort to talk about matters that are protected by a joint defense agreement, by a common interest privilege. You're saying that . . . let's say the facts were as follows. How close the lawyers were is really completely irrelevant. They could have been a thousand miles away, but if they were on a telephone line so that the conversation was going to them, it's with them. And if they were only six feet away, but they're in another room and they're not hearing it and it's not addressed to them, they're not part of the conversation. But if the conversation said . . . let's say the conversation said . . . I'll tell you what. Let's say that there's no suggestion in it of a fraudulent effort to concoct a defense, but one of them says to the other, My recollection is that just about the same time I had the gun and I cocked it and fired, or I removed the cartridge or whatever it was that the video showed, and that would have made a noise and that could explain why this other witness says he heard what he thought was the firing of a BB gun at this time. So what do you think about that? And they discuss it and then they say, We need to talk to our lawyers about this. I think that's a viable theory. So there's no suggestion that they're talking about fraud. They're just talking about their recollection. You say the mere fact that they have a joint defense agreement, that they plan to testify consistently with one another and to adopt a common defense, and have the intention to talk to their lawyers about it in the future, that makes anything that they say within the attorney-client privilege? You've taken that example to an absurd conclusion. No, no, I haven't taken it to an absurd . . . But I would say . . . Let me answer it, Your Honor. How is it not what we have in this case? You have two people who are in a joint defense agreement. They are planning a consistent defense to a charge that's leveled against both of them. And they say, This is what I'm going to testify to. We need to talk to our lawyers about all this. We're planning to do that. Why is that protected when they are not talking to their lawyers about it? You're saying that virtually any conversation, unless it comes with an exception, between two co-defendants who are planning a joint defense is within the attorney-client privilege if they have some intention, which they always would have, to talk to their lawyers about it, if they're going to go ahead with it? I'm saying what the case law that exists on this topic says, that if that particular conversation, Your Honor, would be otherwise privileged . . . and if it was stated to a co-defendant in a common interest arrangement protected by the joint defense agreement, that it would be protected if it pertains to their defense. So can you give me an opinion of our court or the Supreme Court? To start with, any court that would bind us that says what you said, because that's a pretty amazing proposition that you come out with. You say anything that would be privileged if you said it to your lawyer is privileged, although you don't say it to your lawyer, so long as you say it to a co-defendant with whom you have an understanding that you want to deal with this unitedly. I can tell you what the Fourth Circuit said, Your Honor, in 1990. In other words, you're telling me the answer to my question is there's nothing that binds us. Neither us or the government were able to find that on that particular topic. Okay. So now tell me what the Fourth Circuit did. First of all, it applies to both civil and criminal litigation. The rationale for a joint defense rule remains unchanged. Persons who share a common interest in litigation, that's the key. Is there a common interest in a common defense? Not an economic interest, a legal interest. And with each other, to more effectively prosecute or defend their claims, they should be able to communicate with their respective attorneys and with each other. And I've given you four cases, admittedly district court cases, they all say the same thing. That that type of a privilege . . . But any of the . . . you know, those are kind of loose words. Those are kind of loose words because when you say should be able to communicate with their attorneys and with each other, that arguably envisages a conversation in which at least a lawyer is present and the several defendants are present. It doesn't explicitly say that anything that defendants say to one another will be treated as if it was said to the lawyer. It's not anything, Your Honor. But what I was going to ask you is, do you have any cases in which the . . . apart from those loose words that are used in describing the principle, where, as in this case, you don't have any lawyer present, you don't have any advice received by a lawyer, you don't have any advice sought from a lawyer. All you have is a conversation between the two defendants, which undoubtedly, if they decide to go ahead with it, they will discuss with their lawyers. In this regard, information, if information that is otherwise privileged, is shared between parties that have a common legal interest, my point, the privilege is not forfeited, even though no attorney either creates or receives the communication. And the reason I make this argument . . . it would seem to me that one guy says, look, my lawyer said this, this, and this, and I've got these legal rights, and that's communicated among them outside the presence of the attorney. Now, I would agree with you if that's what the issue were here, but that's not. It really is because . . . Let me ask you this, Your Honor. I usually answer questions, but go ahead, take a shot. If the communication was made from Officer Wendell to Mr. Pesonius, Mr. Pesonius, I've done some research. I've thought about our defense. There's an explanation here. There's an alternative explanation to that sound, and that represents the CO2 cartridge being removed. That, and I didn't mean to pose it as a question to you, but that is a privileged communication. The fact that he repeats that . . . Why is it a privileged communication? Because he was talking to his lawyer. Talking to his lawyer about his defense. I'm sorry. You say he was. He was. Hypothetically, he's talking to his lawyer. Yes, Your Honor. Okay. Yeah, that's a privileged communication. Now, that privileged communication, number of cases that we provided you, say that that can be repeated to another member of the joint defense agreement. That can be repeated. We don't have that. Yes, we do. Officer Wendell is sharing that information. This could be our defense . . . But he hasn't had that conversation with an attorney. But think about all the joint defense agreements that exist now. The common interest doctrine, the way in which it was created. It's doctors and lawyers and engineers and developers, all who know more about . . . Let's set aside the civil stuff, because that, to me, is a totally different thing, having tried a lot of civil cases. Well, I have also. And the privilege itself extends in almost the exact same direction and the same contours, Your Honor. You talk to each other. I'll stay with the criminal context, though. Yeah, no, please do. I will. You have Defendant 1, who knows a lot about securities, for example, in a criminal context. He talks to Defendant 2 and says, Listen, I think we have a defense here. I think that we can be exonerated. I have an expert opinion. And he shares it with Defendant 2. That certainly is privileged, because it's covered by parties who are bound by a mutual common interest. He shares the advice he received from his lawyer with the co-defendant. I'm saying he is smart enough to know, as a securities person, that I have a defense here. He's the defendant who says this, says it to his co-defendant. That information is privileged. Assuming that they have signed a joint defense agreement. Exactly. And not only that. Which is what I would do if I were a lawyer, which I don't expect to be probably any time soon. But if I had a joint defense agreement, I would be saying to my client, We have a joint defense agreement. We're going to proceed on this carefully. Do not talk to your co-defendant about any of this stuff. You talk to me, and if we want to share that with them, we'll do that. It's pretty good advice. Except for the fact that there are a number of cases, nothing that binds this court, but a number of cases that talk about the ability to share information. The reason behind the joint defense privilege is to affect the flow of communication. To enhance the type of legal advice I can give to my client. That purpose is served when the joint defendants, the parties themselves, share information ultimately for the purpose of obtaining legal advice. How do they share it with their lawyer? Eventually they do. But before they do that, Your Honor, it's still a privileged communication. It's still a privilege. You could not force someone to say that. You couldn't force defendant A, who has this expert opinion, to turn that over to the government just because he shared it with defendant B. You just couldn't do that. The question we have is whether you could allow another person . . . Well, you could allow . . . You're saying that Kwiatkowski was part of the joint defense agreement. Absolutely. That's been established. He could not be allowed to testify to what was said in this conversation that didn't involve lawyers in it in any way, but did probably involve an intention to discuss it with their lawyers at a future time. Don't go that far, Your Honor. What I say is Kwiatkowski cannot be permitted to testify as to matters that pertain to the defense. You'll know from the FBI 302 in this case, they said specifically . . . Officer Wendell said, I'm talking about our defense. I sent this video that I did some research on. I don't say that any communication among these . . . Let me go back to the authorities. We don't have anything that binds our court. We have some courts, including district courts, that have said things that you say encompass this. Do you have any case where the facts would support, apart from the characterization given by the judge in making a decision, do you have any case by any court in which the facts involved two or more defendants discussing a joint defense, not in the presence of a lawyer, not talking to a lawyer, and not having received advice from a lawyer? Do you have any case that . . . Two of the cases from the Southern District of New York involve . . . Which are they? One is the Gucci America case. It's a civil case. The other is the Millennium case, Millennium Health. They're both from the Southern District. There is a case in the circuit, though, that is important. Are there citations to those cases? In your brief? Absolutely. They're in the appendix. Gucci, all right. Gucci and Millennium Health are cases that both refer to that. But the Schaeffler case that was decided by this court in 2015 talks a little bit about that issue. Which case? Schaeffler, S-C-H-A-E-F-F-L-E-R. It's instructive on that topic, although not determinative. And it says, essentially, that while the privilege is generally waived by voluntary disclosure of the communication to another party, and I agree with that,  that is engaged in a common legal enterprise. That's the restriction, Your Honor. That's why they can't just say anything they want and then claim their privilege. They tried to do that in the Gotti case in the Eastern District, and that was rejected. Such disclosure... That's talking about whether an existing privilege was waived, but here the question is whether there was a privilege at all. I mean, in other words, in your case, you say whether a privilege was waived. If there was a privileged communication, being a communication with a lawyer, do you waive it by telling your co-defendant, this is the conversation I had with my lawyer? So that really is not the circumstances that we have. It's not precisely the circumstances, but it's instructive in the sense that it says, such disclosures remain privileged where a joint defense effort or a strategy has been decided upon and undertaken by the parties, and multiple clients share a common interest about a legal matter. And they justify that sharing of information by saying that there is a paramount importance to have a free flow of information among the defendants to have the best possible legal defense. That case is not cited in your brief, is it? It is, Your Honor. S-C-H-A-E-F-F-L-E-R. Is that the lead name? Because I don't see it in your list of cases. U.S. v. Schaeffler. U.S. v. Schaeffler. It's a criminal case. I still don't see it. Do you have a citation? I see a Schwimmer. No, Schwimmer I know well. I've read it many times. 806 F. 3rd 34. And we also know that this court, both Judge Pooler and Judge Hull, decided Barrett just four months ago. And Barrett was a case, a reasonably similar fact pattern, where mid-trial an individual tried to turn on his co-defendants and then reveal information that was part of the tactics, the strategy, and the defense. The tactics, the strategy, and the defense. And the court said, you can't do that. You simply can't do that. That had been discussed with the lawyer. Yeah, but that's all tied to working with your lawyer. It doesn't say that in the opinion. I don't know how you can conclude that. What's important, though, Your Honor, is that this discussion here, indisputably between Wendell and the other members of the joint defense agreement, indisputably is about a defense. It's in the FBI 302. We are talking about an alternative defense. That's what we're talking about. You cannot deny that. So it's a protected communication. And now sharing it with another co-defendant in an exact same posture, in a common defense, common enterprise defense, is prohibited. And it's prohibited for reasons that I tried to articulate, and it's prohibited for the reasons that you articulate in Barrett. All right. May I ask one more? I thought this was a good place to stop. All right. We'll get a chance. Thank you. Mr. Personius, you have three minutes. May it please the Court. My name is Rodney Personius, and I represent Appellee Joseph Wendell. I want to correct one thing that my colleague said. The Schaeffler case is cited in the government's reply brief. And specifically, Your Honor, it's cited in the government's reply at page 6. It is not cited in the appellee brief. In speaking to exchanging views with Mr. Connors, the Court has questioned whether or not what Mr. Wendell allegedly shared with co-defendants Krug and Kwiatkowski was privileged information. It's at least my understanding that privileged information not only includes advice provided by an attorney, it also includes a communication made for the purpose of obtaining legal advice. And the government agrees with that. In its reply brief at page 4, the government cites the Adelman case and indicates the defendants bear the burden to establish all elements of the privilege, including that the communication was made, and this is important, for the purpose of obtaining legal advice from a lawyer. And that's what the Adelman decision says. What legal advice, given? First of all, do you agree with the representation of the statement? I think it's from the 302, right? So that's what we're arguing about. I agree with that. That's what he's going to come in and testify to, if that's what it is. All right. So the three guys are standing around, right, outside that conference room. They can't even hear what's going on in this room, except for the fact that it's beamed out there, right? Okay. And what legal advice are they trying to obtain from each other? No, the legal advice was the— For the purposes of obtaining legal advice. Yes, that was— What legal advice were they trying to obtain from each other within the context of that discussion? Okay. Your Honor, it's my view that what's important here is the conversation that Mr. Wendell was referring to, the communication that he was referring to. In other words, that he had forwarded the video to his— He was saying that Kwiatkowski should not be permitted to testify to that part of what he said, that part of what he heard when Wendell said, I have sent it to my attorney. That part should not be, according to your argument, should not—is privileged and should not be testified to. Well, our view is the whole conversation shouldn't. It's important, I think, to note— Well, what's wrong with—following the path that Judge LaValle has pointed us down, what's wrong with sending it back with an instruction, he can testify to everything except the one sentence where—in which he has said, the other person has said, I took this video and I sent it to my attorney? Because the substance of what's being discussed is information that Mr. Wendell had communicated. We don't know if it was discussed with the lawyer. We know it was communicated to the lawyer. We know also, importantly, from the record, that it was for the purpose of obtaining legal advice because in District Judge Scretany's decision on this issue, and I'm referring specifically to the appendix, and I think this is the sealed appendix. We have two appendixes. This is the sealed appendix at page 6. Judge Scretany, in about the tenth line down, specifically says, moreover, Kwiatkowski said that the utterance was made while discussing their defense and further states that Wendell told the group he had already passed the information at issue onto his attorney, presumably for the purpose of seeking legal advice. So the district judge has found that it was for the purpose of seeking legal advice. There's a question here about the standard of review that applies. It's our . . . The district judge has found that the sending of the video to the attorney was for the purpose of seeking legal advice. Yes, of seeking legal advice, which is very important because, as I've indicated . . . I don't think we have any doubt that the sending of the video to the attorney was for the purpose of seeking legal advice. Okay, but I think that's enough, Your Honor, as I understand the case law. It doesn't matter what I think, but as I understand the case law, such as the Adelman decision that the government cites at page 4 of its reply, and also the Schaffler case that Mr. Connors spoke about, which is also cited, as I've indicated, in the government's brief at 6, what the government says in its reply brief there is, the purpose of any protected communication must be solely for obtaining or providing of legal advice, and that's what Schaffler says. And I might note that . . . But there's . . . I don't see how this conversation that we are talking about was for any purpose. I mean, it was relating a fact about what one had done. One of the men, your client presumably, had done to send you a video that he wanted then to discuss with you at some point. What I think he's done, Your Honor, if you accept Mr. Kwiatkowski's version, you know I disagree with it, but I don't think that's part of this appeal. Go ahead. I think what Mr. Kwiatkowski is being proposed that he do is that he testify at trial about a confidential communication that Mr. Wendell had with his attorney, Rodney. The fact that he sent you this . . . And the general subject matter of this proposed defense . . . What if we take that out? Well, you're saying what if you just take out the fact he sent it? I've looked at this YouTube video, and he's sharing what it says with the guys as well as the fact that he sent it to you. Yes. And it does this and this, and why can't we say that? Sure, sure. I'm mischaracterizing it. And it's a creative proposal. Right, right. My response . . . But leave the attorney reference out. Sure, sure. Because I think there's no question that was a confidential communication. My best response to that, I think, Your Honor, is to refer to the recent decision of this court in Barrett where the court indicates with Judge Pooler's opinion . . . And Barrett was decided February 15th of this year. The site is 848 Fed Third, 524. And in the . . . if I may please . . . In the Barrett decision, what Judge Pooler wrote was . . . if I may . . . And this is at page 533. We agree that a codefendant who turns government witness during trial may be permitted to testify at that trial provided that the district court takes steps to avoid unfair prejudice. First, the district court must ensure that the testimony of the former codefendant is admitted only for the limited purpose of testifying to events other than the witness's involvement in joint defense planning. This protects the remaining codefendants from any prejudice that would arise from the former codefendant's awareness of defense strategy, pre-trial conversations with codefendants occurring after arrest, or, number three, privileged conversations with counsel. So what we have here, Your Honor, if you accept what I've represented to you is the best interpretation of these circumstances, is that even if you take out, I sent the video to Rodney, you still run into the Barrett issue of undue prejudice, per se, I would argue, undue prejudice, because Mr. Kwiatkowski would be permitted to convey all three of the items that Judge Pooler and Barrett said, this must not happen. And that is, he would be testifying about his awareness of defense strategy. He would be testifying about pre-trial conversations with codefendants occurring after arrest. And I would argue he'd be testifying about the privileged conversations with counsel. And you're saying, Judge, we take that out. You still have the other two concerns that would exist. So that would be my response. You'll note that I concurred with Judge Pooler on that opinion. Yes. Yes, I do. So you've got two out of the three of us here. Well, I hope so. I don't think it decides this case, though. Right. Nor do I. Well, I'm sorry to hear you say that. That would be for us to wrestle with. It was a good try. Well, okay. I would argue that it does. No, but thank you very much for reminding us of that. Sure. Sure. I'm way over on red. Can we make one last point? One last point, yes. Okay. All right. I read the law. And, Your Honor, I can't point to a Second Circuit case that says this. I can't point to a Supreme Court case that says this. But I read the law as a collective whole, including Schwimmer and Schaffler, that we've referred to, as indicating that if a party to a joint defense agreement has a confidential communication with a lawyer and later conveys that confidential communication to other parties in the absence of counsel, that is still protected by the joint defense privilege. I wouldn't disagree with you. I'm not sure anybody would disagree with you. And I think that's what Barrett was saying in part when we were talking. That's exactly what we have here. Well, that's the question. Whether anyone agrees with it or not, it's not this case. Well, the reason it is, Judge, is because what Mr. Wendell was conveying was that he had sent the video to Judge Gretny. Judge Gretny found, in his opinion. If that's all it was, that would come within the proposition. But the fact that he had sent the video to his lawyer was not in any way . . . What he was doing was having a conversation about how they might testify. He wasn't reporting in any way anything that he had told his lawyer about his intentions, or much less that the lawyer had told him in the nature of legal advice. I've always been told, don't say I respectfully disagree. So, I'll just say I disagree, Judge, because everything I say is respectful. I was corrected on that years ago. But, the reason I disagree, Judge, is because Judge Gretny specifically found that Mr. Wendell's communication with Rodney was for the purpose of seeking legal advice. And, as I argue, and as the government concedes in its papers, and as the Second Circuit has held, seeking legal advice is also privileged. And, that's what Mr. Wendell was communicating. Let me ask you . . . Thank you. There's something in the briefing that talks about . . . I know this advice concerns you, and I'm not asking you, did you receive it? But, there's something in the briefing that says that there was nothing showing that the lawyer received it. Yes. What is there of record on that issue? Other than my adamant protestations that I did not. And, Mr. Wendell, because of his military background, would never call me Rodney, either in my presence or out of my presence. So, my point to the Judge was, this is untruthful, Judge. It's unreliable evidence. But, all there is in the record is my statement it didn't happen. What was your statement in the record? I said to Judge Scretany that I didn't receive a video. And, I said to Judge Scretany that my client would never, and never has, never will, despite my insistence, because it makes me feel too old. He never calls me Rodney or Rod. He always calls me Mr. Personius. As I get older, more and more clients insist on that, but his is because of his military background. He's always called me Mr. Personius. Out of my presence, he would never call me Rod. So, that whole statement is just made up? Yes. Well, that's just my view. So, I was refraining from asking you whether you received it or not, but apparently you're volunteering and did volunteer in the district court that you didn't receive it. Now, it occurred to me when I was looking at that and preparing this case, that that doesn't necessarily resolve the question. No, because he could be, he could, at least in theory, have sent it to you and you didn't receive it either because he sent it wrong. He sent it by an email, I suppose. But, it's in my view. I'll tell you. Be totally transparent. It's a made up statement. But, if it's a made up statement, it's wholly unreliable and it shouldn't come in period because that goes back to the Barrett prejudice issue. You seem to be taking the position that he didn't send it to his attorney. Well, I'm an officer of the court. I can't make up facts. But, what we have on the face of this appeal and what Judge Gretny had before him, without deciding whether it's a credible or incredible statement, we have this statement and he found that it shouldn't be admitted, not because it's not credible, but for the separate reason that it violated the common interest rule. You have taken the position in the district court. Yes. Essentially, that it was not sent to you and, in fact, Kwiatkowski just made up a lot of what he's saying. Yes. Yes. And, the further point that I made, Your Honor, is that if it were to be admitted, I then have to make the hard decision of whether or not I continue to represent Mr. Wendell or whether I would have to become a defense witness and probably be disqualified from being his counsel at trial because I'd have to testify this didn't happen. Thank you. It's thorny. Thank you. We'll hear from Mr. Karaszewski with two minutes on rebuttal. Thank you all. Thank you, Your Honor. The defendants in this case would have this court interpret the attorney-client privilege as if it were a co-defendant's privilege. I think we've hit the point enough here that the discussion was not about legal advice. It was not directed to an attorney for getting legal advice. It was just among the co-defendants. It appears that we're moving toward a request that this court interpreted as what could be fairly characterized as a co-defendant's privilege that's not supported by the case law, that is not supported by any court's interpretation of the attorney-client privilege and is in . . . Well, are you suggesting that disclosure to a member of the joint defense agreement is like disclosing it to a stranger to the defense agreement? Well, the joint defense agreement in . . . You just said disclosing it from one member of the JDA to another. Are you suggesting that's like disclosing it to a stranger to the agreement? Well, it's not . . . It may . . . They may have a contractual agreement, but the question here is not what they contracted with each other. The question here is what does the attorney-client privilege require them to establish in order to have it apply? Disclosure to a stranger is relevant as a waiver of something that is privileged. If you have something that's privileged and you disclose it to a stranger, you are saying, I am not maintaining the privilege. I am waiving the privilege by disclosing this outside of the privileged group. If I understand Judge Pooler's question, it presupposed that the thing was privileged originally and the question was, does disclosure of a privileged thing to somebody within the joint defense agreement equal the same thing as disclosing it to a person outside? Your answer would be no, I think, but the issue here is not that. The issue is did this ever become privileged? Does it become privileged merely because two defendants who are sharing a joint defense talk to each other? Is everything that two defendants say to one another when they decide to have a joint defense become privileged when it hasn't involved the transmission of the statements to an attorney for advice and doesn't . . . haven't involved the receipt of advice from an attorney? That's correct, Your Honor. It's a threshold question, and I believe I've made that point in my reply brief, that this is the threshold question of whether it's privileged. Just one last thing. Judge Hall asked what would indicate, where in the record it indicates what Kwiatkowski would say. There is the 302, but also I would point to the . . . Page 9 of your brief quotes it all, right? Yes, the sealed appendix at page 48, which was requested. The district court asked for, give me a proffer of what Kwiatkowski would say, and it was submitted in question and answer form, exactly what he would be asked and what he would answer. So that was at the sealed appendix at page 48. Sealed appendix . . . Page 48, Your Honor. Sealed appendix 48. Thank you, counsel. Thank you. Thank you, all three, for a lively discussion.